UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

GREGORY  AREGOOD, JR.,           )
*et al.*                         )
    Plaintiffs,   )
           )
    vs.          )   No. 1:14-cv-00274-LJM-TAB
           )
GIVAUDAN FLAVORS CORPORATION,    )
*et al.*                         )
    Defendants.   )

## ORDER ON GIVAUDAN MOTIONS FOR SUMMARY JUDGMENT BASED ON THE STATUTE OF LIMITATIONS

Pursuant to the staged case management in this action, the remaining defendant, Givaudan Flavors Corporation ("Givaudan") has moved for summary judgment on the claims brought by Plaintiffs Sharon Smith ("Smith"), Stacy Arndt ("Arndt"), Laura Riley ("Riley") and Robert Holbrook ("Holbrook") (collectively, "Stage 1 Plaintiffs"), based on the statute of limitations defense (the motions collectively, "SOL Motions").  Dkt. Nos. 438, 432, 436 & 434.  For the reasons stated herein, the Court **DENIES** the SOL Motions.

## I. FACTUAL BACKGROUND[1]

The undisputed facts and the facts in the light most favorable to the Stage 1 Plaintiffs follow.  *See Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir. 1996).

---

[1] To streamline this Order, unless otherwise noted, the Court cites to the ECF page number or numbers where the relevant facts are set forth in the parties' briefs and such citation should be presumed to include the exhibit(s) cited therein.  Because many of the background facts are common to all Stage 1 Plaintiffs, the Court will cite to Givaudan's brief regarding Sharon Smith, Dkt. No. 446, and to Sharon Smith's response, Dkt. No. 470, to further condense the fact section.  Facts regarding each individual Plaintiff will cite to the relevant brief as to that Plaintiff.

The Stage 1 Plaintiffs worked in various capacities at a ConAgra Snack Foods Group ("ConAgra") microwave popcorn packaging facility located in Rensselear, Indiana (the "Plant").  Dkt. Nos. 446 at 3 (Smith); 443 at 10 (Arndt); 445 at 3 (Riley); & 444 at 3 (Holbrook).  All of the Stage 1 Plaintiffs allege that their exposure to butter flavors that contained diacetyl, which were sold to ConAgra by Givaudan, caused them to develop bronchiolitis obliterans.  Dkt. Nos. 470-8 (Smith); 467-11 (Arndt); 469 at 9 (Riley); 468 at 10 (Holbrook).

On October 3, 2001, the Wall Street Journal published an article entitled "Butter Flavoring May Pose a Risk to Food Workers" ("Wall Street Journal Article").  *See* Dkt. No. 446 at 2-3.  The article stated that the National Institute for Occupational Safety and Health ("NIOSH") had "alerted health departments all over the country to begin working with popcorn plants to limit workers' exposure to components in artificial-butter flavors. In particular, the agency is warning about diacetyl, a chemical compound that smells and tastes like butter and is the main ingredient in many butter flavors."  Dkt. No. 439 at 7. On the evening the article was published, Jack McKeon ("McKeon"), President of ConAgra's Snack Food Division, sent an email announcement to all ConAgra employees regarding the Wall Street Journal Article.  *Id.* at 6.  The announcement reassured employees that ConAgra's microwave popcorn was "completely safe to manufacture and consume."  *Id.*  It also distinguished the process used at the plant discussed in the Wall Street Journal Article from that at the Plant, particularly with respect to the "slurry production."  *Id.*  Further, the announcement stated, "There is adequate ventilation in each [of our] facilit[ies] to insure that the air in the facility is exhausted several times an hour. In the facilities where slurry production is in a contained room, there is a separate

2

continuous air ventilation system for that room." *Id.* The email also informed employees that ConAgra had agreed to participate in NIOSH's ongoing study of the matter. *Id.*

On December 27, 2002, McKeon prepared another memorandum to all employees that detailed NIOSH's investigation of airborne diacetyl levels and the health of ConAgra employees at several ConAgra facilities. Dkt. No. 438 at 4-5. The December 2002 memorandum further advised that ConAgra was "developing procedures for annual spirometry testing (breathing test) for all employees as part of [its] overall comprehensive safety program." *Id.* at 5. It was ConAgra's practice to distribute this type of memoranda at employee meetings and to post it on the safety board in the Plant. Dkt. No. 446 at 4.

In September 2003, and August 2004, dozens of ConAgra employee filed lawsuits against Givaudan and other flavor manufacturers in Ohio alleging that exposure to butter flavors during their employment with ConAgra caused them to develop respiratory injuries. *Id.* at 4. Also in Ohio, hundreds more ConAgra employees filed such lawsuits in 2007, 2008, and 2010. *Id.* at 4-5. Plaintiffs' lawyers in those cases are the same as those of the Stage 1 Plaintiffs here and the asserted claims are very similar if not identical. *Id.* at 5.

Following the NIOSH investigation of the ConAgra plant in Marion, Ohio, the company participated in a program to monitor the health of employees at the Plant and implemented new policies to reduce employee exposure to butter flavors. Dkt. No. 446 at 5. By 2006, ConAgra had enclosed the batch deck at the Plant, which is where butter flavors were added to batch tanks, and mixed with oil and salt. *Id.* At the same time the batch deck was enclosed, ConAgra implemented a policy that made respirators mandatory for any employee entering the batch deck area. *Id.* Rensselaer Plant

manager, Ken Dobin ("Dobin"), held a meeting with each work crew to discuss this new policy. *Id.* at 5-6. ConAgra's management claims that the employees were told at the meeting that the new mandatory respirator policy was being implemented as a safety precaution because of the NIOSH investigation at ConAgra's Marion, Ohio, plant. *Id.* at 6.

Richard Arndt, who worked at the Plant and is Plaintiff Arndt's husband, testified that the employees at the Plant were told when the batch deck was enclosed that the Plant was becoming "diacetyl free." Dkt. No. 446 at 7.

Around this time, ConAgra conducted air sampling studies at the Rensselaer Plant. Dkt. No. 446 at 6. Smith, Arndt and Riley were asked to wear air monitors during work to facilitate the investigation. *Id.* (Smith); Dkt. No. 443 at 7 (Arndt); Dkt. No. 445 at 5 (Riley).

Further, ConAgra began to monitor the respiratory health of its employees. Dkt. No. 446 at 6. Beginning in 2005 and continuing through 2011, employees at the Plant, including all Stage 1 Plaintiffs, underwent yearly pulmonary function testing. *Id.* (Smith); Dkt. No. 443 at 6 (Arndt); Dkt. No. 444 at 7 (Holbrook); Dkt. No. 445 at 6 (Riley). ConAgra hired Dr. Lockey, from the University of Cincinnati College of Medicine ("UC") to conduct the study of its employees' respiratory health. Dkt. No. 446 at 6.

When the breathing tests were administered, Plant employees were asked to fill out questionnaires regarding any respiratory symptoms they experienced and whether such symptoms occurred or became worse while they were at work. *Id.* Questions included: "Does your chest feel tight or is your breathing difficult?"; "When you are *at work*, does your chest feel tight?"; and "Are there any chemicals, substances, job activities or particular areas of the plant that seem to result in chest tightness or breathing

difficulty?" *Id.* Plant employees, including all Stage 1 Plaintiffs, were sent letters from UC that provided information regarding the results of their individual breathing tests. *Id.* at 6-7 (Smith); Dkt. No. 443 at 8 (Arndt); Dkt. No. 444 at 8 (Holbrook); Dkt. No. 445 at 6 (Riley). In addition, all the Plant employees who participated in the pulmonary medical surveillance program were sent notice of the findings from Dr. Lockey. Dkt. No. 446 at 7. The letter explained that Plant employees' participation in the study allowed UC "to reach some conclusions regarding the potential health consequences associated with exposure to butter flavorings with diacetyl at the ConAgra microwave popcorn facilities." *Id.* at 7-8. The letter reported:

> This study of employees producing microwave popcorn demonstrated no significant impact of diacetyl exposure on lung function values in the large majority of workers. However, the findings indicate that some employees within certain groups who worked as mixers in the slurry rooms prior to use of respirators starting in April 2003 have decreases in the amount of air they can blow out of their lungs in one second, referred to as FEV1. These same data from mixers indicates that exposure to butter flavoring with diacetyl in the slurry room prior to April 2003 can result in airway obstruction. . . . Similar findings in regard to diacetyl exposure were not discovered in any other groups of employees at the production facilities.
>
> * * *
>
> . . . Overall, the results indicate that working with butter flavoring with diacetyl at the concentrations historically found within the slurry rooms prior to respirator use at the ConAgra facilities represented a potential risk for loss of lung function. This health finding was not seen in employees who worked outside the slurry room area.

*Id.* at 8; Dkt. No. 470-5.

Sometime in 2007 or 2008, ConAgra stopped using butter flavors that contained diacetyl at the Plant. Dkt. No. 446 at 7. When this change was made, ConAgra included language on its popcorn packages that advertised "no diacetyl added." *Id.*

In a letter dated February 15, 2010, Dr. Lockey advised the study participants that the findings had been published in the July 2009 issue of the European Respiratory Journal. Dkt. no. 446 at 8. The February 2010 letter enclosed an abstract of the article, which was entitled, "Airway Obstruction Related to Diacetyl Exposure at Microwave Popcorn Production Facilities," ("Journal Abstract") *Id.* The Journal Abstract begins: "Obstructive lung diseases including bronchiolitis obliterans have been reported among microwave popcorn production employees. Butter flavourings [sic] including diacetyl have been associated with these findings." *Id.*

Richard Arndt testified that as late as 2012, none of the workers at the Plant who were experiencing breathing problems asked him if diacetyl or even butter flavors were causing their health problems. Dkt. No. 470 at 5-6.

In 2012, NIOSH published a pamphlet directed to healthcare providers that advised on how to recognize, respond and report butter flavoring related lung disease. Dkt. No. 469-10.

## A. FACTS SPECIFIC TO PLAINTIFF SHARON SMITH

Sharon Smith was employed at the Plant since 1998. Dkt. No. 446 at 3. Smith admits that she saw a copy of McKeon's October 3, 2001, memorandum and the attached Wall Street Journal article, both of which were posted on the bulletin board in the break room at the Plant. *Id.* However, she cannot remember when she saw the article, how long it was up, or that she had any discussion about it with any of her co-workers or anyone else at the Plant. Dkt. No. 470 at 3.

Smith does not recall seeing McKeon's December 27, 2002, memorandum. Dkt. No. 470 at 4. She testified that she was unaware that ConAgra had concerns about

diacetyl or that the breathing tests she took were to determine whether or not diacetyl was causing lung injury. *Id.* at 4-5.

Smith does recall attending a meeting with Dobin when employees were told that respirators were mandatory in the batch deck area; that employees who were not trained to use a respirator were not permitted in that area; and that violation of the mandatory respirator rule would result in termination. Dkt. No. 446 at 5-6. However, Smith had no understanding of why the batch deck area was closed and never related it to diacetyl, diacetyl in butter flavors, or NIOSH's investigation at the Marion, Ohio, plant. Dkt. No. 470 at 5, 6.

In 2005, Smith received a letter from UC stating that she had restriction in her lung function; the letter suggested that she seek further evaluation at the Arnett Clinic in Lafayette, Indiana. Dkt. No. 446 at 7. Additional pulmonary function tests at the Arnett Clinic showed that Smith had low lung capacity; Smith received another letter from UC that explained these results. Dkt. No. 446 at 7.

Smith testified that her symptoms, beginning with shortness of breath, became noticeable sometime after 2006. Dkt. No. 446 at 7.

Smith received the letter from Dr. Lockey in 2008 that discussed the overall findings of the study. Dkt. No. 470 at 6.

Smith admits that she received Dr. Lockey's 2010 letter and the Journal Abstract. Dkt. No. 446 at 8. She testified further that the letter raised a question in her mind as to whether the abnormal results of her pulmonary function tests may have been related to her work with butter flavors at the Plant. *Id.* However, Smith never worked in the slurry room. Dkt. No. 470 at 7.

Smith read another letter dated January 18, 2011, from Dr. Lockey, regarding her medical surveillance evaluation.  Dkt. No. 446 at 8.  The letter stated, in pertinent parts:

> Your pulmonary medical questionnaire on 10/18/10 indicated that when working with salt at work you can develop tingling, burning, or stinging of the eyes, nose or throat, frequent sneezing or difficulty breathing.  No other pulmonary symptoms were reported.
>
> You should discuss with Mr. Wayne Waite, Director of Health and Safety at ConAgra Snack Foods . . . how better to control and avoid potential irritant exposures in your job position.
>
> Your pulmonary function tests from 10/18/10 are similar to previously available results and continue to demonstrate a restrictive pattern.  These values have been stable since 2005 and may be related to your increased body weight for an individual 63 inches tall.
>
> * * *
>
> Copies of your pulmonary function tests are enclosed for your files and should be shared with your physician along with a copy of this letter within the next few weeks.

Dkt. No. 470-4.

Although Smith has conflicting testimony about when she contacted an attorney and performed internet research regarding "diacetyl," taken in the light most favorable to her, she retained an attorney in 2012, and did the internet research after a meeting she had with co-workers and attorneys in 2012.  Dkt. No. 470 at 7; Dkt. No. 446 at 8.

On or about March 11, 2013, Dr. Pue diagnosed Smith with "[f]lavoring induced Bronchiolitis Obliterans Syndrome."  Dkt. No. 470-8.

## B.  FACTS SPECIFIC TO STACY ARNDT

Stacy Arndt began working at the Plan on October 6, 1994.  Dkt. No. 443 at 10.  In 1995, Arndt began experiencing respiratory issues including coughing, hoarseness, throat-clearing, sinusitis, and eye irritation.  Dkt. No. 433 at 10.

Arndt testified that she never saw McKeon's email memorandum that referenced the 2001 Wall Street Journal article. Dkt. No. 467 at 3. Similarly, Arndt testified that she never saw McKeon's December 27, 2002, email memorandum. *Id.* at 4. She claims that she doubted the documents were posted in the break room because "[i]f these got posted, people would be talking about it, and [she] [hadn't] heard nobody talking about them." *Id.*

Ardnt claims that before 2003, she developed a severe and intermittent cough that would last for days or a month at a time. Dkt. No. 443, at 10. In 2003, Arndt had surgery to remove vocal cord polyps, which she claims improved her cough but did not eliminate the problem. *Id.* According to Arndt, since 2003, she has experienced a severe cough three to four times per year, which is accompanied by dizziness and wheezing. *Id.* at 10-11.

Arndt also claims that she has experienced shortness of breath since at least 2005. Dkt. No. 443 at 11. She testified that she used to walk on trails, but claimed that her last attempt to walk a trail was more than ten years prior to her deposition in 2015, and that the attempt gave her trouble breathing. *Id.*

Arndt did not have any knowledge of ConAgra's reasons for enclosing the batch deck in or around 2006. Dkt. No. 467 at 5. She does not recall any employee meeting with Dobin or a discussion about the need to wear respirators in the batch deck area. *Id.* at 5-6. Arndt further stated that she attended monthly meeting at the Plant, but does not recall one where the health hazards of butter flavors; the NIOSH investigation at the Marion, Ohio, plant; diacetyl; or respiratory issues were discussed. *Id.* at 6. Further, she had no knowledge of the purpose of the air sampling studies being performed at the Plant or the breathing studies performed by Dr. Lockey. *Id.*

Ardnt recalls continued shortness of breath in 2008 and by 2009, she was having significant respiratory problems that she chose not to disclose on the medical questionnaire that she completed that year in conjunction with the pulmonary function testing at the Plant. Dkt. No. 443 at 11. She claimed that in 2009 she "couldn't breathe." *Id.*

Ardnt was sent letters from Dr. Lockey and/or UC regarding her pulmonary test results; but Ardnt testified that she did not recall the information in them. *Compare* Dkt. No. 443 at 8-9 *with* Dkt. No. 467 at 6. Further, there is no evidence in the record that Ardnt received the April 8, 2008, letter from Dr. Lockey that explained the findings of the study and announced that they would be published. Dkt. No. 443 at 9 (citing to Smith's deposition and Exhibit 9 thereto). Moreover, although there is evidence that Ardnt was sent Dr. Lockey's February 15, 2010, letter and the Journal Abstract, Ardnt denied that she received it. *Compare* Dkt. No. 443 at 9 *with* Dkt. No. 467 at 6.

Ardnt denies that she knew that the Plant became diacetyl free in 2007 or 2008, either through employee meetings or from her husband, Richard Arndt. Dkt. No. 467 at 6. She testified that because they made popcorn, "We thought, you know, everything was safe." *Id.*

Ardnt stated that "[s]omewhere from 2007 to 2008 [she] saw news reports" about the potential link between exposure to butter flavors and respiratory disease. Dkt. No. 467 at 7. Arndt did not learn about the Ohio law suits until the fall of 2012 after her husband, Richard Arndt, returned from a trip to the Marion, Ohio, plant and learned that

people who worked there were sick.  Dkt. No. 467 at 5.  Arndt testified that she did not talk about work with her husband, who was in management.[2]  *Id.*

Ardnt stated further that she learned that her injuries were related to exposure to butter flavors at work from Dr. Pue in 2013.  Dkt. No. 467 at 7.  "Prior to that, [she] did not know that there was a probability or even a reasonable possibility that [she] was exposed to sufficient levels of butter flavors, diacetyl, or diacetyl substitutes to cause [her] injuries."  *Id.  See also id.* at 8 (citing deposition testimony regarding newspaper clippings she glanced at in 2007 or 2008).

## C. FACTS SPECIFIC TO LAURA RILEY

Laura Riley has been employed at the Plant since 2000.  Dkt. No. 445 at 3.  Riley does not recall ever seeing McKeon's 2001 email memorandum or the attached 2001 Wall Street Journal article.  Dkt. No. 469 at 3.  Similarly, Riley testified that she never saw McKeon's December 27, 2002, email memorandum and she cannot recall that anyone at ConAgra shared the contents of this memorandum with her at any time.  *Id.* at 4.

Riley denies that she knew anything about law suits alleging injuries from exposure to butter flavorings by other ConAgra employees between 2003 and 2012.  Dkt. No. 469 at 4.  She testified that the first time she learned of those law suits was during her deposition in this matter sometime in 2015.  *Id.*

---

[2] Givaudan asserts that Richard Arndt discussed work issues with his wife, Stacy Arndt, however, it cites no testimony to support that statement.  Dkt. No. 443 at 7.  Even if Richard Arndt did discuss work issues with his wife, the Court must take the facts in the light most favorable to Stacy here, and that would be that she does not recall discussing work issues with Richard Arndt other than those specifically referenced in this section.

Riley claims that she began to experience respiratory problems including shortness of breath, insomnia and fatigue, after she started working at the plant, but before 2005. Dkt. No. 455 at 7. She testified that sinus problems started earlier. *Id.*

Although Riley acknowledged that the batch deck had been enclosed by 2006, Dkt. No. 445 at 5, she testified that she had "no idea" why ConAgra made the change. Dkt. No. 469 at 5. Further, Riley does not recall any employee meeting where she was told that respirators were mandatory in the batch deck area or that this policy was because of any NIOSH investigation of ConAgra's Marion, Ohio, plant. Dkt. No. 469 at 5.

With respect to air sampling studies, Riley testified that she wore a monitor for a single day, but was never told the purpose of the test other than that it was to measure the level of things in the air at the Plant. Dkt. No. 455 at 5; Dkt. No. 469 at 5.

Riley participated in the mandatory yearly breathing test, but was never told it was part of a large study being conducted by Dr. Lockey. Dkt. No. 455 at 6; Dkt. No. 469 at 5. Although Riley testified that she never received any letter from Dr. Lockey with results of her yearly testing, Dkt. No. 469 at 5, a letter from Dr. Lockey addressed to Riley dated September 14, 2005, stated that she had an obstructive pattern or decreased lung function. *Id.* at 8. However, the letter stated that this condition "may be related to your history of cigarette smoking." *Id.*

Riley never received Dr. Lockey's April 8, 2008, letter or his February 15, 2010, letter with the Journal Abstract. Dkt. No. 469 at 5.

Notwithstanding co-plaintiff and manager testimony to the contrary, Riley denies that she attended employee meetings in or around 2007 or 2008 in which she was told that the Plant was becoming "diacetyl free." Dkt. No. 469 at 5. Riley testified that she

12

was unaware that butter flavorings contained diacetyl until she met Dr. Pue in 2013.  *Id.* at 6.

Riley reported that the worst exposure she had to butter flavorings was when she emptied dumpsters that contained empty butter flavor bags and the powder flew up into her face.  Dkt. No. 445 at 8.  She claimed that when that happened, it instantly made her feel as if she could not breathe.  *Id.*  She testified that when this occurred, she had a runny nose, sinus irritation, and severe coughing spells.  *Id.*  She associated that with a direct inhalation of a large quantity of powder.  *Id.*  Riley testified that she emptied the dumpsters twice per shift, but out of all the times she dumped the containers, the powder flew into her face once.  Dkt. No. 469 at 7; Dkt. No. 436-2 at 11 (Riley Dep. at 180-81).

In 2009, Riley learned from a co-worker that she had failed one of her breathing tests.  Dkt. No. 469 at 9.  At that time, she had her own doctor perform a test.  *Id.*  As a result of that test, Riley's doctor told her that she had chronic obstructive pulmonary disease, or COPD.  *Id.*

Riley testified that the only letter that she recalls receiving from Dr. Lockey was dated June 2012, but she received it a year later in June 2013.[3]  Dkt. No. 469 at 5.  The letter dated June 2012, stated that Riley's lung function had been decreasing since 2005 and that potential culprits included cigarette smoking, underlying asthma and/or increased body weight for an individual 68 inches tall.  *Id.* at 8; Dkt. No. 469-8.  It recommended that Riley consult her personal physician or a pulmonary specialist for further testing to

---

[3] Riley's deposition testimony regarding correspondence from Dr. Lockey is confusing. Riley was clear, however, that she recalls that the only letter she received from the UC program was dated June 2012, but she received it in June 2013.  Dkt. No. 469-1 at 18 (Riley Dep. at 228).

determine the cause of her decreasing lung function.  *Id.*  The only reference to Riley's work environment in this letter states, "These tests will also help your physician determine whether it is safe for you to continue to work in your current job task with no restrictions." Dkt. No. 469-8.

Until 2012, Riley associated her shortness of breath, insomnia, fatigue, and sinus problems with smoking.  Dkt. No. 469 at 6.  Riley testified that she did not suspect butter flavorings as a cause of her problems until November 2102, when she received a text message that directed her to a website that explained the connection between butter flavorings and lung disease.  *Id.*  After visiting the website, Riley thought she "saw some of the signs of maybe what was going on" with her and decided to get a breathing test to determine if her suspicion was correct.  *Id.*

In May 2013, Dr. Pue diagnosed Riley with bronchiolitis obliterans caused by her exposure to diacetyl in the butter flavorings in her workplace.  Dkt. No. 469 at 9.

### D.  FACTS SPECIFIC TO ROBERT HOLBROOK

Robert Holbrook started employment at the Plant in 2000.  Dkt. No. 444 at 3.  He testified that he never received McKeon's 2001 email and the attached Wall Street Journal article.  Dkt. No. 468 at 3.  Holbrook denies that anyone told him in 2001 of the outbreak of lung disease in the Jasper, Missouri, plant.  *Id.*  Similarly, Holbrook testified that he had never seen McKeon's December 27, 2002, memorandum before his deposition, and the contents of it had never been shared with him.  *Id.* at 4.

Holbrook testified that he was unaware of the law suits filed by ConAgra employees in Ohio between 2003 and 2010.  Dkt. No. 468 at 5.

14

Holbrook travelled to the Marion, Ohio, plant on ConAgra business, but testified that he did not make a connection between the NIOSH investigation occurring there and his own health and safety at the Rensselaer Plant because he was focused on the relative efficiency of the plants. Dkt. No. 468 at 5. Holbrook testified that he was never told the specifics of the hazard NIOSH was investigating at the Marion, Ohio, plant. *Id.* at 6.

Holbrook recalls that the enclosure of the batch deck at the Rensselaer Plant occurred prior to 2006, and that it became ConAgra's policy to mandate respirators in that area, in part because of testing performed by NIOSH at the Marion, Ohio, plant. Dkt. No. 444 at 5. Holbrook also recalls attending the meeting held by Dobin to discuss the new policy. Dkt. No. 444 at 6. Holbrook testified that he assumed the respirators were needed for a breathing-related hazard, *id.* at 6-7, and for "general safety as opposed to any specific threat in the same way some workers were required to wear hardhats or safety glasses." Dkt. No. 468 at 5-6.

Holbrook underwent yearly respiratory testing and knew that Dr. Lockey from UC was hired to conduct a study at the Plant. Dkt. No. 444 at 7. However, Holbrook testified that he was never given a specific reason for the test. Dkt. No. 468 at 6. In a UC questionnaire dated February 23, 2005, Holbrook reported that he had been experiencing chest tightness for two years, which sometimes occurred at work. Dkt. No. 444 at 8. In the same questionnaire, he reported that he had been experiencing wheezing since 2003 and that he had been to a doctor's office or emergency room nine times in the past twelve months for wheezing or chest whistling. *Id.* In a subsequent questionnaire dated January 25, 2006, Holbrook reported that he had been experiencing wheezing. *Id.*

Holbrook knew that in 2007 or 2008 ConAgra stopped using butter flavorings that contained diacetyl and that the company changed its packaging to reflect that fact. Dkt. No. 444 at 7. Holbrook denies, however, that he knew the company made the change for safety reasons. Dkt. No. 468 at 6.

Although Dr. Lockley sent at least four letters to Holbrook regarding the results of his breathing tests, Holbrook testified that he did not receive any of those; but Holbrook recalled another one that mentioned that he had scar tissue. Dkt. No. 444 at 8; Dkt. No. 468 at 7; Dkt. No. 468-2 at 21-22 (Holbrook Dep. at 268-73). He did not see a doctor after receiving this letter. Dkt. No. 444 at 8. Even if he had received them, the four letters addressed to Holbrook inform him that any pulmonary obstruction that he had may have been caused by cigarette smoking or underlying asthmatic conditions. Dkt. No. 468 at 7.

Holbrook never received Dr. Lockey's April 8, 2008, letter or his February 15, 2010, letter with the Journal Abstract. Dkt. No. 468 at 7.

Holbrook did not make any connection between the ingredients in the butter flavorings used at the Plant and his lung disease symptoms until he was invited to attend a meeting in 2012. Dkt. No. 468 at 10. Holbrook testified that this meeting occurred at least a couple of weeks after August 25, 2012. *Id.* Prior to that meeting, no one had told Holbrook that butter flavorings or diacetyl could cause lung disease or be responsible for his wheezing and chest tightness. *Id.*

Holbrook saw Dr. Pue in February 2013. Dkt. No. 468 at 10. Dr. Pue was the first health care provide who informed him that his lungs had been injured as a result of his exposure to butter flavorings. *Id.*

Holbrook filed this law suit in January 2014. *See*, *generally*, Dkt. No. 1-1.

16

## II.  <u>SUMMARY JUDGMENT STANDARD</u>

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); s*ee also United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267-68 (7th Cir. 1990).  Motions for summary judgment are governed by Federal Rule of Civil Procedure 56, which provides in relevant part: "The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials showing that a fact either is or cannot be genuinely disputed.  Fed. R. Civ. P. 56(c)(1).  A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, (1986).  The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986); *Oliver v. Oshkosh Truck Corp.,* 96 F.3d 992, 997 (7th Cir. 1996).  It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying applicable evidence.  *See Bombard v. Ft. Wayne Newspapers, Inc.,* 92 F.3d 560, 562 (7th Cir. 1996).

In evaluating a motion for summary judgment, the Court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. *See Estate of Cole v. Fromm,* 94 F.3d 254, 257 (7th Cir. 1996). The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *See Anderson,* 477 U.S. at 248; *JPM Inc. v. John Deere Indus. Equip. Co.,* 94 F.3d 270, 273 (7th Cir. 1996). Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute. *See Clifton v. Schafer,* 969 F.2d 278, 281 (7th Cir. 1992). If the moving party does not have the ultimate burden of proof on a claim, it is sufficient for the moving party to direct the Court to the lack of evidence as to an element of that claim. *See Green v. Whiteco Indus., Inc.,* 17 F.3d 199, 201 & n. 3 (7th Cir. 1994). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.,* 94 F.3d 1121, 1124 (7th Cir. 1996).

### III. <u>ANALYSIS</u>

Givaudan asserts that each Stage 1 Plaintiff knew of should have discovered that their symptoms were indicative of harm caused by butter flavorings well before January 24, 2012, which is two years prior to the date this law suit was filed. In its replies, Givaudan relies primarily on the alleged notice each Plaintiff had of the Wall Street Journal Article, McKeon's 2002 email, various measures that ConAgra started to implement in 2000 and later to test their respiratory function and/or to improve respiratory safety at the

Plant, including enclosure of the batch deck before 2006, as well as the NIOSH investigation at other plants owned by ConAgra, to show that each could have and should have discovered the cause of their respiratory issues well before January of 2012. *See* Dkt. Nos. 485 at 1-2 (Smith); 482 at 1-2 (Arndt); 484 at 1-2 (Riley); & 483 at 1-2 (Holbrook). The Stage 1 Plaintiffs argue that these facts, as well as the others set forth above, are not enough under Indiana's discovery rule to prove as a matter of law that any Plaintiff could have or should have discovered their injury was caused by butter flavorings in their workplace prior to February 24, 2012. *See* Dkt. No. 470 at 11-19 (Smith); Dkt. No. 467 at 13-21 (Arndt); Dkt. No. 469 at 11-19 (Riley); Dkt. No. 468 at 11-20 (Holbrook). The Court agrees with the Stage 1 Plaintiffs because Givaudan has painted Indiana's discovery rule with too broad a brush and confused constructive notice and personal suspicion with a diagnosis of reasonable possibility.

## A.  INDIANA DISCOVERY RULE

In essence, Givaudan relies upon the standard set forth by the Indiana Supreme Court in *Barnes v. A.H. Robins Co.*, 476 N.E.2d 84 (Ind. 1985). In that case, which arose out of litigation regarding harm allegedly caused by the Dalkon shield intrauterine device, the Indiana Supreme Court was asked by the Seventh Circuit Court of Appeals to determine the test for "when a cause of action accrues for personal injury accidents when injury to plaintiff is caused by a disease which may have been contracted as a result of protracted exposure to a foreign substance." 476 N.E.2d at 84. Although the *Barnes* plaintiffs had symptoms and problems with the device dating back to 1972, it was not until April 1981, when they saw or were alerted to a *60 Minutes* report about the alleged dangers of the device, that they contacted a lawyer and eventually filed suit in August

1981. *Id.* at 84-85. The trial court had rejected the *Barnes* plaintiffs' argument that their cause of action did not accrue until they discovered the causal link between their injuries and the Dalkon shield. *Id.* at 85.

Drawing upon case law that interpreted the Indiana Legislature's intent with respect to the Occupational Diseases Act as well as case law from other jurisdictions answering the same question, the *Barnes* court adopted a "discovery type rule" in limited cases. *Id.* at 86-87. Specifically, the *Barnes* court "limit[ed] [its] finding [] to . . . an injury to a plaintiff caused by a disease which may have been contracted as a result of protracted exposure to a foreign substance." *Id.* at 87. In those cases, the statute of limitations "commences to run from the date the plaintiff knew or should have discovered that she suffered an injury or impingement, and that it was caused by the product or act of another." *Id.* at 87-88. The *Barnes* court reasoned, "It is contemplated that persons armed with these indices have a fair opportunity to investigate available sources of relevant information and to decide whether to bring their claims in court within the time limitations in the statute." *Id.* at 88.

After *Barnes*, the Seventh Circuit applied the rule in *Evenson v. Osmose Wood Preserving Company of America.* 899 F.2d 701 (7th Cir. 1990). In *Evenson*, a wood treatment worker was exposed to chromated copper arsenate ("CCA") starting in 1980. *Id.* at 702. In 1983, the worker developed several sinus issues that required medical treatment that a general practitioner diagnosed as hay fever, asthma, nasal polyps and allergic rhinitis. In December 1983, a specialist removed the worker's nasal polyps. *Id.* In April 1984, an allergist diagnosed the worker with asthma, nasal polyps, and aspirin sensitivity, as well as other allergies.

On February 20, 1985, the worker became concerned that his problems were caused by CCA and asked his general practitioner to test his urine for the chemical. *Id.* About a month later, the worker left the wood treating company because of his medical problems. *Id.* The next day, the physician reported that the worker's test result was normal and that CCA was not causing the worker's health issues. *Id.*

In April 1985, the worker had more polyps removed. *Id.* Although he asked the surgeon to check them for CCA, the surgeon was unable to determine the cause of the polyps and the worker's questions regarding a link to CCA went unanswered. *Id.*

In June 1985, the worker switched to Veteran's Administration ("VA") hospital care in Indiana; then he moved to Wisconsin in September 1986 and received care at various VA hospitals in that state. *Id.*

On December 3, 1986, the worker met with an attorney who was involved in CCA litigation. *Id.* In January 1987, the worker saw a neurologist associated with the University of Wisconsin who told the worker that exposure to CCA for any length of time is extremely hazardous; but tests done in February 1987 failed to show arsenic in the worker's hair. *Id.* On March 13, 1987, the worker filed a claim in state court, alleging strict liability in tort, negligence, willful misconduct for failure to warn of the dangers associated with CCA exposure, and for fraudulent concealment of such dangers. *Id.* In April 1987, a medical toxicologist in Denver, Colorado, confirmed the worker's suspicion that CCA caused his injuries. *Id.* The district court granted summary judgment for the wood treating company because the statute of limitations had started to run in 1983 when the worker suspected that CCA was the cause of his injuries. *Id.*

21

To start its analysis, the Seventh Circuit articulated that the *Barnes* standard has two prongs: "(1) that the plaintiff suffered an injury or impingement; and (2) that the injury or impingement was caused by the product or act of another." *Id.* at 703. Applying this standard to the worker's case, the Seventh Circuit concluded that the worker knew he was experiencing medical problems in 1983; but, there was a question about "when [the worker] knew or should have discovered that his injuries were caused by his exposure to CCA." *Id.* In reviewing the evidence on this question, the Seventh Circuit concluded that the worker's "mere suspicion, even when coupled with the start of an investigation," is not enough. *Id.* at 705. Specifically, "where knowledge of causation is at issue, a person knows or should have discovered the cause of his injury when he has or should have discovered some evidence that there was a reasonable possibility that his injury was caused by the act or product of another." *Id.* Further, "[a] reasonable possibility, while less than a probability, requires more than the mere suspicion possessed by [the worker], a layperson without technical or medical knowledge." *Id.*

There is no question that the Indiana Supreme Court agrees with the Seventh Circuit's conclusion in *Everson* because in 2001 it applied the analysis in *Degussa Corp. v. Mullens*. 744 N.E.2d 407, 411 (Ind. 2001). In *Degussa*, the Indiana Supreme Court stated that "[o]nce a plaintiff's doctor expressly informs the plaintiff that there is a 'reasonable possibility, if not a probability' that an injury was caused by an act or product, then the statute of limitations begins to run and the issue may become a matter of law." *Id.* (quoting *Van Dusen v. Stotts*, 712 N.E.2d 491, 499 (Ind. 1999)). When a plaintiff receives such advice, she must then seek additional medical or legal advice to resolve any remaining uncertainty or confusion as to the cause of her injuries. *Id.* "An

unexplained failure to seek additional information should not excuse a plaintiff's failure to file a claim within the statutorily defined time period."  *Id.*

Applying these rules to the facts in the light most favorable to the Stage 1 Plaintiffs in this action, the Court must conclude that the statute of limitations did not begin to run for any of them until a doctor expressly informed each of them that there was a "reasonable possibility, if not a probability" that their injury was caused by their exposure to butter flavorings.  Taking each Stage 1 Plaintiff in turn, the Court concludes as follows.

## B.  SHARON SMITH

With respect to the facts of Sharon Smith's diagnosis, the evidence in the light most favorable to her reveals that Smith may have had a suspicion that her respiratory symptoms were caused by some chemical in the butter flavors at the Plant in 2010 when she received Dr. Lockey's 2010 letter with the Journal Abstract.  But, the 2010 letter hardly confirmed any suspicion Smith had because it disavowed any respiratory issue/butter flavorings connection for workers outside the slurry room, and Smith did not work in that room.  Dkt. No. 470-5.  Further, Dr. Lockey's January 18, 2011, letter failed to confirm any of Smith's suspicion because it specifically connected her respiratory symptoms to her weight, not to any chemical exposure she may have had at the Plant.  Dkt. No. 470-4.  It was not until she performed internet research in 2012, retained a lawyer, and obtained a diagnosis from Dr. Pue on or about March 11, 2013, that Smith's suspicion that the cause of her respiratory symptoms might be related to her exposure to butter flavorings matured into a "reasonable possibility" as required by the case law.  For these reasons, Givaudan's SOL Motion as to Smith must fail.

## C.  STACY ARNDT

Stacy Arndt developed respiratory-related health issues as early as 1995, Dkt. No. 433 at 10.  She had surgery to remove vocal cord polyps in 2003, *id.*; however, there is no evidence that Arndt or any of her healthcare providers diagnosed these issues as being related to her exposure to any chemical in her work environment.  Givaudan's reliance on McKeon's emails in 2001 and 2002, and Dobin's 2006 meeting with employees, as well as Richard Arndt's knowledge, to show that Stacy Arndt was on notice that her exposure to butter flavors could cause respiratory issues like hers is misplaced. First, Arndt denies ever seeing the emails, which were sent in an era when most individuals had access to email on a personal computer, if at all.  Second, Arndt denies ever being in a meeting with Dobins during which he discussed the reasons for enclosing the batch deck.  Even if Arndt did recall being at the meeting, there is no evidence that Arndt was even suspicious about the cause of her symptoms because she did not work in the batch deck area and she presumed that the chemicals were safe because they were being put on food for human consumption.  The only reasonable inference is that by 2006 Ardnt had made no connection between her work environment and her respiratory symptoms, which is wholly unlike the suspicion the wood treatment worker had regarding causation.

Further, Arndt denies receiving any letters about her pulmonary function tests results from Dr. Lockey.  But, even if she had received the letter dated January 19, 2007, or the one dated April 28, 2008, nothing in those letters suggested that any loss in pulmonary function that Arndt experienced was caused by exposure to chemicals at the Plant as opposed to some other cause.

24

Moreover, Ardnt stated that "[s]omewhere from 2007 to 2008 [she] saw news reports" about a potential link between exposure to butter flavorings and respiratory disease. Dkt. No. 467 at 7. The evidence suggests that by 2009, Arndt was having significant respiratory problems that she did not disclose during the yearly pulmonary function testing at work. Dkt. No. 443 at 11. But, Arndt was unaware of the reasons behind the tests, or that Dr. Lockey was using them for a study, or the results of the study that Dr. Lockey shared in April 2008, and in February 2010, which included the Journal Abstract. Dkt. No. 467 at 6. In addition, Arndt testified that she did not learn about the Ohio law suits by other ConAgra employees until the fall of 2012. Dkt. No. 467 at 5. Most importantly, Arndt never had a physician make a connection between her pulmonary issues and butter flavorings at the Plant until she met with Dr. Pue in 2013.

Based on these facts, Arndt was not informed by a physician of a reasonable possibility that her respiratory illness was connected to or caused by her exposure to butter flavorings at the Plant until 2013, well within the two-year statute of limitations in this case. Even if the Court could conclude that due to her knowledge of her symptoms and the Ohio law suits, which she learned of in the fall of 2012, Arndt was on notice of a reasonable possibility that her illness was caused by butter flavorings, this suit filed in January 2014 is within the statute of limitations. For these reasons, Givaudan's SOL Motion as to Arndt must be denied.

## C.  LAURA RILEY

Givaudan's evidence as to Laura Riley is also suspect. Riley began experiencing sinus problems first, then shortness of breath, insomnia and fatigue, prior to 2005. Dkt. No. 455 at 7. She denies any knowledge of a NIOSH investigation and the reasons

behind any air sampling study or the mandatory, yearly breathing tests performed at the Plant.  Dkt. No. 469 at 5.  Further, Riley denies that she received any letters from Dr. Lockey regarding results of her respiratory testing.  Dkt. No. 469 at 5.  However, even if she had received the results, in September 2005, Dr. Lockey said that her decreased lung function "may be related to [her] history of cigarette smoking."  Dkt. No. 469 at 8.  Similarly, Riley denies receiving any other letter from Dr. Lockey regarding the more general results of his study, which focused on potential issues for workers in the slurry area, or the Journal Abstract.  Dkt. No. 469 at 5.

Riley admits that she had a single butter flavor powder exposure that caused her to feel as if she could not breathe, and other respiratory-related issues; however, she testified that she associated that with a direct inhalation of a large quantity of powder, not with any chemical contained in the powder that was harmful.  Dkt. No. 445 at 8.

Riley did get concerned about her respiratory issues in 2009 when she learned from a co-worker that she had failed her yearly breathing test.  Dkt. No. 469 at 9.  But, when her doctor performed additional tests, he associated the result with COPD.  *Id.*

Even the letter from Dr. Lockey that Riley admits seeing never put her on notice that her reduced pulmonary functioning could be caused by her exposure to butter flavorings in the Plant.  The only letter from Dr. Lockey that Riley claimed to have seen was dated June 2012 and associated her decreased lung function since 2005 to cigarette smoking, underlying asthma and/or increased body weight.  Dkt. No. 469-8.  Although the letter mentioned that she should see her own physician for additional tests, Dr. Lockey suggested that the tests would "determine whether it was safe for [her] to continue to work in [her] current job task with no restrictions."  *Id.*  This suggestion is a far cry from a

conclusion that Riley's respiratory issues were associated with or caused by exposure to butter flavorings or the chemicals contained within them.

In fact, until November 2012, Riley testified that she associated her respiratory illness with smoking. Dkt. No. 469 at 6. When she received a text message that directed her to a website that explained the connection between butter flavorings and lung disease, Riley thought she "saw some of the signs of maybe what was going on" and decided to get a breathing test to determine if her suspicion was correct. *Id.* In May 2013, Dr. Pue diagnosed Riley with bronchiolitis obliterans caused by her exposure to the butter flavorings in her workplace. Dkt. No. 469 at 9. Based on these facts, the earliest that Riley had anything more than a reasonable suspicion that her respiratory illnesses were related to her work environment was in November 2012 when she performed internet research, a date that is still within the statute of limitations. However, under the Indiana Supreme Court's articulation of the standard in *Degussa*, a physician had not made the connection to a "reasonable possibility" until May 2013. For these reasons, Givaudan's SOL Motion as to Riley is without merit.

### D. ROBERT HOLBROOK

Starting at the Plant in 2000, Robert Holbrook began experiencing respiratory-related health issues in or around 2003. Dkt. No. 444 at 8. Specifically, he reported in a UC questionnaire dated February 23, 2005, that he had tightness in this chest for two years, which sometimes occurred at work; he reported wheezing since 2003. *Id.* Holbrook had been to the doctor's office or an emergency room nine times for wheezing or chest whistling between February 2004 and February 2005. *Id.* However, there is no

evidence in the record that either Holbrook or his treating physicians linked these respiratory problems to chemicals Holbrook had been exposed to at the Plant.

Holbrook denies any knowledge of either the outbreak of lung disease at the Jasper, Missouri, plant in 2001, Dkt. No. 468 at 3; or the specific hazard that NIOSH was investigating at the Marion, Ohio, plant. Dkt. No. 468 at 5. The latter denial is despite the fact that he travelled to the Marion, Ohio, plant on ConAgra business during the time frame of the NIOSH study. Dkt. No. 468 at 5. Holbrook said he was focused on the relative efficiency of the plants, not on health and safety at his own Plant, *id.*, which the Court must take as true for purposes of this motion. Up to this date, there is no evidence that Holbrook even had suspicion about the cause of his respiratory issues.

Holbrook testified that he knew that the batch deck at the plant was enclosed in or around 2006 because of the result of the NIOSH study, but he was never privy to the results of the study or the reason respirators were made mandatory in that area of the Plant. Dkt. No. 444 at 5-6. Holbrook assumed the respirators were needed for a breathing-related hazard, but ConAgra never told him the nature of the potential hazard. Dkt. No. 444 at 6-7; Dkt. No. 468 at 5-6. Similarly, he knew that ConAgra moved away from diacetyl-containing butter flavorings in 2007 or 2008, however, Holbrook testified that he did not know it was for safety reasons. Dkt. No. 444 at 7; Dkt. No. 468 at 6.

Givaudan's reliance on Dr. Lockey's letters and Journal Abstract are also unavailing. Holbrook testified that he received only one letter from Dr. Lockey. Dkt. No. 444 at 8; Dkt. No. 468 at 7. That letter, which is not in evidence, mentioned that he had scar tissue. Dkt. No. 468-2 at 21-22 (Holbrook Dep at 268-73). As previously set out in the fact section of this Order, even if Holbrook had received Dr. Lockey's four letters, at

most the letters implied that any pulmonary obstruction that Holbrook had may have been caused by cigarette smoking or an underlying asthmatic condition, not any chemical in his working environment.  Dkt. No. 468 at 7.

The earliest that Holbrook made any connection between his respiratory illness and the ingredients in butter flavorings used at the Plant was after August 25, 2012, when he was invited to attend a meeting.  Dkt. No. 468 at 10.  It is reasonable to infer that Holbrook had a suspicion at this point that his problems might be related to his exposure to butter flavorings; however, such a suspicion is insufficient under Indiana law for the statute of limitations to begin.  Even if it did begin to run in August 25, 2012, this date is within two years of the date this law suit was filed.  Prior to August 2012, the record is devoid of evidence of a reasonable suspicion much less a reasonable possibility. Holbrook did not have a physician tell him there was a reasonable possibility that his lungs had been injured because of the chemicals in butter flavorings until he saw Dr. Pue in February 2013, which is well within the statute of limitations.  Therefore, under the Indiana Supreme Court's standard in *Degussa*, Givaudan's SOL Motion as to Holbrook must be denied.

## IV. **CONCLUSION**

For the reasons stated herein, the Court **DENIES** Defendant Givaudan Flavors Corporation's motion for summary judgment on the claims brought by Plaintiffs Sharon Smith, Stacy Arndt, Laura Riley, and Robert Holbrook, based on the statute of limitations defense.  Dkt. Nos. **438, 432, 436 & 434**.

IT IS SO ORDERED this 4th day of April, 2017.

LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Electronically distributed to all registered attorneys of record via ECF.