UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

GREGORY  AREGOOD, JR.,　　　　)
*et al.*　　　　　　　　　　　　)
　　　　　　　　Plaintiffs,　　)
　　　　　　　　　　　　　　　)
　　　　vs.　　　　　　　　　)　　　No. 1:14-cv-00274-LJM-TAB
　　　　　　　　　　　　　　　)
GIVAUDAN FLAVORS CORPORATION,　)
*et al.*　　　　　　　　　　　　)
　　　　　　　　Defendants.　　)

## ORDER ON GIVAUDAN MOTION FOR SUMMARY JUDGMENT
## AS TO ALL PLAINTIFFS

Remaining Defendant Givaudan Flavors Corporation ("Givaudan") has moved for summary judgment on the claims brought by all Plaintiffs because (1) Plaintiffs cannot prove that Givaudan's conduct was the proximate cause of their injuries, rather ConAgra failed in its duty to protect Plaintiffs, Gregory Aregood, Jr., Rick Arndt, Sandy Arndt, David Black, Luther Daniel Cole, Rick Ellis, Rhonda Gross, Michele Hedden, Leslie Hinman, Robert Holbrook, Kathy Howard, Michael Hudak, Marvin Jeffrey, Grace Jones, Kent Korniak, Shirley Legrand, Stephen Lilly, Bob Maciejewski, Jr., Janalu Mckay, Randi Nagel, Laura Riley, Sharon Smith, William Tompkins, Brian Vallee, Dave Walker, Rebecca Yoder, Linda Zickmund (collectively, "Plaintiffs"),  from harm; (2) Count II for failure to warn is barred by Indiana's sophisticated intermediary doctrine; (3) Count I for strict liability and Count III for common law negligence are not viable under the Indiana Products Liability Act ("IPLA"); and (4) Plaintiffs' claim for punitive damages fails with their underlying claims (the "global MSJ").   Dkt. No. 455.   For the reasons stated herein, the Court **GRANTS in part and DENIES in part** Givaudan's global MSJ.

# I. FACTUAL BACKGROUND[1]

Plaintiffs provide no citations to any evidence to dispute the facts presented by Givaudan.  *See generally*, Dkt. No. 36.  Rather, Plaintiffs set forth additional material facts that they assert create a genuine issue for trial, or entitle them to summary judgment on Givaudan's learned intermediary defense.  *Id.* at 4-21.  With that proviso, the undisputed facts and the facts in the light most favorable to the Plaintiffs follow.  *See Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir. 1996).

Plaintiffs worked in various capacities at a ConAgra Snack Foods Group ("ConAgra") microwave popcorn packaging facility located in Rensselear, Indiana (the "Plant").  Dkt. Nos. 457 at 1.  Plaintiffs allege that their exposure to butter flavors that contained diacetyl, which were sold to ConAgra by Givaudan, caused them to develop respiratory injuries.  *Id.*

## A.  GIVAUDAN'S KNOWLEDGE REGARDING BUTTER FLAVORS

For many years Givaudan, or its predecessors-in-interest, has been a member of the Flavor and Extract Manufacturers Association ("FEMA"), a trade association for flavoring companies that promotes food flavorings.  Dkt. No. 466 at 6.  In 1985, FEMA provided Tastemaker, Givaudan's predecessor-in-interest, access to a service called Flavor and Fragrance Ingredient Data Sheet ("FFIDS") that contained information regarding hazards of flavoring chemicals.  *Id.*  The FFIDS for diacetyl stated that upon inhalation, diacetyl was "harmful" and "capable of producing systemic toxicity."  *Id.*  There

---

[1] To streamline this Order, unless otherwise noted, the Court cites to the ECF page number or numbers where the relevant facts are set forth in the parties' briefs and such citation should be presumed to include the exhibit(s) cited therein.

is no evidence, however, that FEMA or any other organization had specifically linked diacetyl or butter flavors to respiratory illness at this time. Dkt. No. 481 at 8.

In 1986, Givaudan was a party to two lawsuits brought by employees of International Bakers Services ("IBS") who alleged that they suffered from lung disease from exposure to hundreds of flavoring chemicals at their plants. *Id.* at 6; Dkt. No. 481 at 7. Diacetyl was among the 46 chemicals that those plaintiffs' experts opined combined to cause the adverse health effects. *Id.* at 6; Dkt. No. 481 at 7. However, Givaudan was dismissed from the cases prior to the IBS plaintiffs' experts ever offering this opinion. Dkt. No. 481 at 7.

In 1992, Tastemaker/Givaudan learned that one of its former employees, Janice Meenach Irick, who worked at its plant near Cincinnati, Ohio, had died from chronic lung disease. Dkt. No. 466 at 7; Dkt. No. 481 at 8-9. In fact, the County Coroner requested "all reports and health records concerning Ms. Irick's disability" from Tastemaker/Givaudan. Dkt. No. 466-10. Around that same time, Tastemaker/Givaudan became aware of cases of bronchiolitis obliterans, or other chronic lung diseases, in at least two other workers at the same plant, Joey Wallace and Clifford Walker. Dkt. No. 466 at 7; Dkt. No. 481 at 8-9. However, the company did not know what, if anything, at its plant was causing some of its employees to have respiratory problems, but it did start to investigate possible causes. Dkt. No. 481 at 9.

In 1992, Tastemaker/Givaudan required its personnel to wear goggles and a full face respirator when working with liquid diacetyl. Dkt. No. 466 at 7; Dkt. No. 466-12. Specifically, Tastemaker/Givaudan's Operational Procedures required: "Any room containing diacetyl in a liquid state must be labeled respirator required . . . . Whenever

material is in any tank, lids must be closed.  If ventilation (mechanical) is not connected to tank or is unavailable, a respirator must be worn at all times while in the room." Dkt. No. 466-12 at 2.  The procedures suggested that chemical goggles were required when working in a room that contained powdered diacetyl or powder formed from liquid diacetyl. *Id.*

By 1993 Tastemaker/Givaudan had created a task force to investigate the lung injuries at its plant.  Dkt. No. 466 at 8; Dkt. No. 481 at 9-11.  Diacetyl was one of many chemicals used at the Tastemaker/Givaudan plant that the company investigated.  Dkt. No. 466 at 8; Dkt. No. 481 at 9-11.  But, at that time, there was no publicly available toxicity data about diacetyl or information connecting diacetyl to respiratory illness.  Dkt. No. 481 at 9-11.

MSDS sheets from Tastemaker/Givaudan during the 1990s did not include warnings regarding use of respirators when using products containing liquid diacetyl or products that contained powdered diacetyl, such as butter flavors.  Dkt. No. 466 at 8.  The MSDSes stated that in well ventilated areas, respirators were not normally required.  *Id.* Consistently with its internal policy regarding working with materials that contained powdered diacetyl, the butter flavor MSDSes suggested that protective gloves and chemical goggles should be worn.  *Id.*

Between 1992 and 1996 at least 8 employees of Tastemaker/Givaudan were diagnosed with bronchiolitis obliterans.  Dkt. No. 466 at 9.  Two of these diagnoses were confirmed in 1994 by Dr. Stuart Brooks, an occupational medicine specialist retained by Tastemaker/Givaudan.  *Id.* Dr. Brooks studied the problem with Givaudan, but concluded that none of the ingredients used at Givaudan were known to cause bronchiolitis

obliterans.  Dkt. no. 481 at 10-11.  Although Dr. Brooks recommended further investigation to determine the cause and prevent other employees from suffering similar fates, Givaudan fired him before he could perform that work.  Dkt. No. 466 at 9.

Rather than contacting the National Institute for Occupational Safety and Health ("NIOSH") to investigate the outbreak of the disease, in 1994 Givaudan hired specialists from the University of Cincinnati to conduct an investigation.  *Id.* at 9-10.  These specialists included Roy McKay, a pulmonary toxicologist; James Lockey, M.D., an occupational medicine physician; and Susan Pinney, Ph.D., an epidemiologist.  *Id.* at 10.  Each specialist was required to sign a nondisclosure and confidentiality agreement.  *Id.*

In his role to design and carry out a pulmonary function surveillance program, McKay was frustrated by his inability to be frank with employees at Givaudan about the dangers of noncompliance with his recommended respirator policy.  *Id.* at 10-11.  He explained that he "was limited into the type of language and wording [he could] use to describe the potential respiratory hazard that may exist."  *Id.* at 11.  For example, an industrial hygienist "reminded [McKay] never to say the word bronchiolitis obliterans to any of the workers . . . ."  *Id.*  Further, copies of presentations to workers had to go through public relations and management to ensure they were happy with them.  *Id.*  McKay also testified that he was not free to fully describe the severity of the respiratory condition the workers could develop if they failed to comply with the respiratory problem.  *Id.* at 12.  McKay felt that he could have done more to protect workers if Givaudan had invested more money into his surveillance and protection programs.  *Id.* at 12-13.  Moreover, McKay was very frustrated that when he identified problems with respirators, or otherwise,

he was told "tell me about it but don't put it in writing. It was just different. It was a different way of operating . . . ." *Id.* at 13.

Dr. Lockey testified that he was concerned about what was happening at the Givaudan facility and could have done more to help, but the company never asked him to proceed further. *Id.* at 14; Dkt. No. 466-24 at 240-42. At the end of his study, Dr. Lockey believed that the respiratory issues were related to exposure to acetaldehyde. Dkt. No. 481 at 10-11. He never made a connection between diacetyl and the Givaudan worker's respiratory complaints. *Id.* at 10. If it had not been for Givaudan's confidentiality agreements, Dr. Lockey would have published his results. Dkt. No. 466 at 14.

In September 1995, researchers had identified several chemicals that could be causing the respiratory issues, including bronchiolitis obliterans, one of which was diacetyl. Dkt. No. 466 at 14; Dkt. No. 466-26.

Dr. Stuart Brooks, an occupational medicine specialist who Givaudan also hired to help determine the cause of respiratory complaints at its plant, concluded that none of the ingredients used at Givaudan were known to cause bronchiolitis obliterans. Dkt. No. 481 at 10-11.

In 1997, Givaudan anonymously informed FEMA, the members-only trade association, that employees of a member company had been diagnosed with an undetermined respiratory illness. Dkt. No. 466 at 14; Dkt. No. 466-6 at 26-29. Apparently, this prompted FEMA to hold a workshop in March 1997 to focus members on respiratory safety practices. Dkt. No. 466 at 14-15; Dkt. No. 466-6 at 27-28; Dkt. No. 466-28. The invitation to the workshop warned that: "Exposure to respiratory irritants without proper safety procedures may cause severe permanent injury." Dkt. No. 466 at 15. At the

workshop, Cecile Rose, M.D., an occupation medicine physician and John Martyny, a certified industrial hygienist, both from National Jewish Health Center, educated the attendees on lung function, occupational lung disease (including bronchiolitis obliterans), and causes of lung disease including irritant chemicals; diacetyl was not amongst them. Dkt. No. 466 at 15; Dkt. No. 466-30. The materials included NIOSH's Health Hazard Evaluation.[2] Dkt. No. 466-30.

Givaudan believed that confidentiality regarding its formulas and any potential respiratory issue at its plants was necessary because it "did not want to give [its] competitors some information that they could use to make noises about, you know, our facility possibly being an unreliable source of supply, give them a competitive advantage . . . it might hurt [its] reputation." Dkt. No. 466 at 23.

During the period between 1994 and 2000, Tastemaker, then Givaudan,[3] sold hundreds of thousands of pounds of butter flavors to ConAgra's Marion, Ohio, plant. Dkt. No. 466 at 15-16. Givaudan's salesperson for ConAgra, Peter Angelo, testified that he was unaware that workers in one of the butter flavor plants had been diagnosed with bronchiolitis obliterans in the early 1990s. *Id.* at 16. Further, he was unaware that the company initiated an investigation into lung disease at the plan, that an outbreak of disease among workers at the plant had been suspected, or that pulmonary function testing had been performed on Givaudan's employees at the plant. *Id.* Angelo stated that he was unaware of any danger associated with diacetyl or using butter flavors that

---

[2] Plaintiffs claim that this attachment discusses findings at an IBS facility. Dkt. No. 466 at 15. However, the Court has no way to evaluate that statement because the NIOSH materials were not included with Plaintiffs' exhibit. *See* Dkt. No. 466-30.
[3] Tastemaker was sold to Givaduan in 1997. Dkt. No. 466 at 15.

contained diacetyl without ventilation. *Id.* Angelo claimed that he was the only way for ConAgra to know this information, other than through an MSDS. *Id.*

During the period between October 2001 and December 2003, Givaudan sold nearly 41,000 pounds of butter flavors to the Plant. Dkt. No. 466 at 19. During this period Givaudan made only one change to its MSDS for butter flavors; it still warned that inhalation would cause "[i]rritation of throat & lungs." *Id.* at 19-20. The MSDS that accompanied shipments in or after July 2003, also stated, "In well ventilated areas respiratory protection is not normally required. In confined or poorly ventilated areas or if material is toxic by inhalation, the use of approved respiratory protection is recommended." Dkt. No. 466-41 at 4. "Ventilation meeting acceptable standards [was] recommended." *Id.* For spills or leaks of the butter flavor, the 2003 MSDS recommended use "of 'NIOSH' approved respiratory protection . . . ." *Id.* Further, the 2003 MSDS specifically stated that "good industrial hygiene practices should be followed in order to avoid inhalation and contact with skin and eyes." *Id.* at 5.

From 2005 to 2007, during which Givaudan sold over 100,000 pounds of butter flavors to ConAgra, Givaudan's MSDS sheets made similar statements. *See* Dkt. No. 466 at 20-21. Plaintiffs contend that Givaudan's policy to refuse to disclose the chemical formula for its butter flavors made it impossible to discover any relevant exposure limits. *Id.*

## B. CONAGRA'S KNOWLEDGE REGARDING BUTTER FLAVORS

Givaudan's predecessor company, Tastemaker, began selling butter flavors to ConAgra's plant in Marion, Ohio, in 1993. Dkt. No. 466 at 4-5.

ConAgra has been making and selling microwave popcorn since approximately 1978 through its predecessor Golden Valley Microwave Foods; it is considered a leader in the industry. Dkt. No. 457 at 5. In the early 1990s, ConAgra also owned Hunt-Wesson, which sold the Orville Redenbacher brand of microwavable popcorn. *Id.*

ConAgra has known since the early 1990s that the butter flavors it purchased contained the chemical diacetyl and that diacetyl is a volatile organic compound. *Id.* It has also known that butter flavors it used contained other volatile organic compounds. *Id.* Further, ConAgra knew at this time that ingredients in butter flavors were capable of irritating the respiratory tract, even seemingly innocuous substances like salt. *Id.*

When it developed products, ConAgra sometimes worked directly with butter flavor suppliers including Givaudan and its predecessor, Tastemaker; Hunt-Wesson; and Bush Boake Allen Americas. *Id.* at 5-6. In fact, ConAgra admits that it worked closely with Tastemaker and then Givaudan to develop butter flavors for use in its products. *Id.* at 6. More importantly, ConAgra knew that the butter flavors it purchased from Tastemaker and later Givaudan, and other suppliers, contained diacetyl because ConAgra's scientists regularly communicated with the suppliers about the amount of diacetyl in the flavors. *Id.*

Although not diacetyl focused, in the early 1990s, ConAgra studied the volatile organic compounds released from microwave popcorn. *Id.* It published an article regarding the subject in 1991. *Id.*

In addition to its own microwave popcorn business, ConAgra also knew about the ingredients of butter flavors because it owned Armour Food Ingredients ("Armour"), which made and sold the products. *Id.* ConAgra knew that Armour's butter flavors contained diacetyl at a concentration of 48,000 parts per million and ran a trial for one of Armour's

products in late 1990. *Id.* at 6-7. At that time, ConAgra would have received a Material Safety Data Sheet ("MSDS") regarding the product that contained information about health hazards and risks related to butter flavors. *Id.* at 7.

ConAgra had an extensive industrial hygiene program that included procedures for dealing with chemical hazards such as risk assessment, monitoring prioritization, health hazard assessment, air sampling, record keeping, employee notification requirements and specific industrial hygiene responsibilities for management and employees. *Id.* at 7. ConAgra employs a number of people to manage safety in its plants including a Director of Health and Safety for the Snack Foods Division, who has responsibility for all of its popcorn facilities. *Id.* Further, each plant has a safety coordinator with responsibilities specific to that plant and who meet regularly with their peers to discuss safety and health issues at the plants. *Id.* Moreover, ConAgra regularly provides safety training for its employees. *Id.* Safety materials, including MSDSes, were posted in a specific area of ConAgra's plants and it trained employees on where to find the information. *Id.* The safety supervisor at each plant was responsible for maintaining and updating MSDSes. *Id.* at 8. Safety personnel reviewed the information in the MSDSes and used the information in them to develop plant safety procedures and to determine whether and what safety precautions to implement to protect ConAgra employees working with materials such as butter flavors. *Id.* There is no dispute that ConAgra received MSDSes from its butter flavor suppliers over the years. *Id.* In addition to MSDSes, ConAgra's safety information included other information about hazardous materials and the use of personal protective equipment. *Id.* at 7.

Between 1994 and 2001, the MSDSes ConAgra received regarding butter flavors advised that the materials could be a respiratory irritant and that respiratory protection should be worn when working with them, particularly when the vapor concentration was high due to heat or in confined, poorly-ventilated areas. *Id.* at 8. At least two of the MSDSes ConAgra received regarding butter flavors advised to avoid inhalation. *Id.*

Plaintiffs assert that the MSDSes were inadequate for several reasons. Dkt. No. 466 at 16-17. Specifically, because they failed to suggest that a respirator be worn when using butter flavors; they only warned of "irritation" and stated that "in well ventilated areas respiratory protection is not required;" and they failed to list diacetyl as an ingredient, citing trade secrets. Dkt. No. 466 at 16-17.

Jack McKeon, President of ConAgra's Snack Food Division, testified that it believed that butter flavors were safe for use by its workers. Dkt. No. 466 at 5-6. McKeon stated that the information from ConAgra's suppliers, including MSDSes, was the best information available at the time. *Id.*

The ConAgra Plant where Plaintiffs worked began using butter flavors from Givaudan in 2001. *Id.* at 4.

In the fall of 2001, management at ConAgra, including those responsible for the plant in Rensselear, learned about a potential association between butter flavors that contained diacetyl and bronchiolitis obliterans. *Id.* at 9. Those managers included: McKeon; Mike Bley, then-vice president of Operations of ConAgra's Snack Foods Division; James Montealegre, then-vice president of Procurement, Product Development, Graphics and Legal Services; and Wayne Waite, then-supervisor of Safety and Health. *Id.* at 9 n.12.

Specifically, in September 2001, the NIOSH contacted ConAgra for its help in an investigation into the potential relationship between butter flavors and bronchiolitis obliterans.  Dkt. No. 457 at 11-12.  NIOSH asked if it could inspect ConAgra's popcorn plant in Hamburg, Iowa.  *Id.* at 11-12.  NIOSH conducted a site visit and conducted air sampling at that plant in November 2001.  *Id.* at 12.

In addition to ConAgra's direct involvement with NIOSH, the company was aware of the potential health issues related to butter flavors from another source.  On October 3, 2001, the Wall Street Journal published an article entitled "Butter Flavoring May Pose a Risk to Food Workers" ("Wall Street Journal Article").  *Id.* at 9.  The article discussed incidents of "serious lung ailments" in two dozen workers at the Glister-Mary Lee ("GML") popcorn plant in Jasper, Missouri, which were allegedly caused by exposure to butter flavors.  *Id.*  The article reported that the NIOSH had alerted health departments to start working with popcorn plants "to limit workers' exposure to components in artificial butter flavorings."  *Id.*  Moreover, the article identified diacetyl, the chemical that provides the butter smell and taste, as an ingredient to be addressed.  *Id.*

That same day, McKeon sent an email memorandum to all ConAgra employees that referenced the Wall Street Journal article and explained that, at NIOSH's request, ConAgra had agreed to participate in NIOSH's ongoing study.  *Id.* at 9-10.  McKeon testified that he sent that memo to provide employees with the information that ConAgra was aware of the story and that ConAgra's position was that its plants "were fine" and ConAgra would "cooperate in any way [it was] asked to cooperate . . . ."  Dkt. No. 458-1 at 4 (McKeon Dep. at 15).  The announcement reassured employees that ConAgra's microwave popcorn was "completely safe to manufacture and consume."  *Id.* at 6

(McKeon Dep. Ex. 2). It also distinguished the process used at the plant discussed in the Wall Street Journal Article from that at the Plant, particularly with respect to the "slurry production." *Id.* Further, the announcement stated, "There is adequate ventilation in each [of our] facilit[ies] to insure that the air in the facility is exhausted several times an hour. In the facilities where slurry production is in a contained room, there is a separate continuous air ventilation system for that room." *Id.* The email also informed employees that ConAgra had agreed to participate in NIOSH's ongoing study of the matter. *Id.*

Moreover, ConAgra belongs to a trade association of popcorn producers called the Popcorn Board. Dkt. No. 457 at 10. In October 2001, the same month the Wall Street Journal Article was published, the Popcorn Board created a Worker Safety Ad Hoc Committee, which included representatives from ConAgra. *Id.* On October 10, 2001, the Worker Safety Ad Hoc Committee met to discuss the issue of bronchiolitis obliterans and butter flavors. *Id.* Montealegre and Bley attended the meeting. *Id.* At the meeting, representatives from NIOSH presented a report on their investigation into lung disease and diacetyl use at the GML, Jasper plant. *Id.* ConAgra learned that NIOSH had inspected the Jasper plant and had begun an inspection at a popcorn plant in Nebraska. *Id.* The NIOSH representatives specifically discussed their investigation results including the potential association between butter flavors and lung disease. *Id.*

After this presentation, the Popcorn Board decided to prepare tip sheets for the industry related to this issue and to pursue testing from private sector vendors to compare and evaluate the NIOSH findings. *Id.* at 11. In a conversation with another Popcorn Board member, Montealegre stated that ConAgra agreed that "the cat is out of the bag"

and it was in the best interests of the industry to work with the Popcorn Board on these issues. *Id.*

The Popcorn Board prepared the "tip sheets" and later in October 2001 provided drafts to ConAgra and other members of the Worker Safety Ad Hoc Committee. *Id.* The drafts recommended mandatory personal protective equipment for mixing room associates, including respirators that had an organic vapor and high-efficiency particulate filter. *Id.* There was also a tip sheet that recommended ventilation in popcorn plants to protect workers from exposure to butter flavors. *Id.*

In November 2001, the Popcorn Board distributed a copy of a workbook published by the Flavoring Extract Manufacturers Association ("FEMA") entitled, "Respiratory Safety in the Flavor and Fragrance Workplace." *Id.* ConAgra received that workbook. *Id.*

On November 13, 2002, McKeon prepared another memorandum to all employees that discussed NIOSH's conclusions regarding issues of worker safety at the Glister-Mary Lee plant. Dkt. No. 466 at 17-18; Dkt. No. 466-35 at 2. In the November 2002 memo, McKeon stressed the differences between the mixing room set up at GML versus that at the Plant. Dkt. No. 466-35 at 2. He reassured the employees "that [its] microwave popcorn is completely safe to manufacture, prepare, and consume." *Id.* He reported further that federal health officials said "that there is no evidence that microwave popcorn poses any risk to consumers." *Id.* In addition, McKeon stated that ConAgra's "microwave popcorn uses only raw materials that are approved for human consumption by the Food and Drug Administration (FDA)." *Id.* He also reiterated that ConAgra's processes were regulated by several state and federal agencies. *Id.*

On December 13, 2002, McKeon prepared another memorandum to all employees that detailed NIOSH's investigation of airborne diacetyl levels and the health of ConAgra employees at several ConAgra facilities. Dkt. No. 466-35. The December 2002 memo explained how the GML, Jasper, Missouri, process was much different from that used at ConAgra's plants. *Id.* at 2. It also reiterated that the raw materials ConAgra used were approved for human consumption by the FDA, and that its processes were regulated by state and federal agencies. *Id.* McKeon's December 2002 memo touted that tests performed in its plants for diacetyl, as well as other airborne materials, indicated levels below the Occupational Safety and Health Administration ("OSHA") permissible exposure levels. *Id.* The December 2002 memorandum further advised that ConAgra was "developing procedures for annual spirometry testing (breathing test) for all employees as part of [its] overall comprehensive safety program." *Id.* at 3.

Early in 2003, McKeon again reassured employees at the Marion, Ohio, plant that ConAgra was cooperating with NIOSH to study the health and safety of popcorn workers in the industry. Dkt. No. 466 at 18; Dkt. No. 466-36 at 2-3. In a memorandum to all Marion employees dated January 28, 2003, McKeon again explained that, in contrast to the open system used at the popcorn facility NIOSH studied in Missouri, ConAgra used a "food-quality closed system, proper ventilation and an isolated mixing process." Dkt. No. 466-36 at 2. McKeon further restated that air quality test results for dust exposure at all of ConAgra's facilities were better than what OSHA found acceptable. *Id.* Moreover, the results of tests performed at Marion by an independent laboratory alongside those of NIOSH were "superior to those of the Missouri plant, both in the mixing room and on the production floor." *Id.* at 2-3. McKeon reported that there were no confirmed cases of

bronchial issues caused by flavorings at ConAgra; but it developed a plan to test and monitor lung capacity to calm any concerns. *Id.* at 3. He advised the Marion workers that details about the plan would be forthcoming, then reminded them that if they wanted a respirator, they could request one. *Id.* McKeon also stated that the company continued to evaluate "whether or not to make respirator use mandatory in the mixing room," and they would continue to work with NIOSH, too. *Id.* He concluded, "We're always looking for ways to improve your safety at work, and for that reason, you should anticipate changes – now and going forward." *Id.*

By 2005 ConAgra was working with the University of Cincinnati, Occupational & Environmental Medicine Department, to perform spirometry testing for its employees in Marion, Ohio. Dkt. No. 466 at 18-19; Dkt. No. 466-37 at 2. Talking points for a meeting with employees dated January 2005, suggest that ConAgra had already adopted recommendations from NIOSH, including the use of a different protocol for spirometry testing. Dkt. No. 466-37 at 2. The talking points further stated that NIOSH had issued a final report on its findings for the Marion plant and there was "no real 'new' news or new NIOSH opinions in [the] report." *Id.* at 3. In addition, the message stated that "neither the company nor NIOSH ha[d] determined that the plan [was] unsafe. In fact, [ConAgra] [took] precautions in the manufacturing process to ensure the safety of [its] employees." *Id.* Management at ConAgra was "confident that [the] popcorn manufacturing plants are safe workplaces, and that microwave popcorn is completely safe to manufacture and consume." *Id.* The talking points also stated that if there was confirmation of a suspected case of an employee with bronchiolitis obliterans, there was "no evidence to suggest that the disease is a result of employment at [the] plant." *Id.* at 4. With respect to lawsuits

filed by workers in Missouri against International Flavors and Fragrances, the ConAgra talking points stated, "I can tell you we strictly follow ingredient manufacturers' instructions for handling and use of all ingredients." *Id.* at 5.

## II. SUMMARY JUDGMENT STANDARD

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); s*ee also United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267-68 (7th Cir. 1990). Motions for summary judgment are governed by Federal Rule of Civil Procedure 56, which provides in relevant part: "The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials showing that a fact either is or cannot be genuinely disputed. Fed. R. Civ. P. 56(c)(1). A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, (1986). The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986); *Oliver v. Oshkosh Truck Corp.,* 96 F.3d 992, 997 (7th Cir. 1996). It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary

judgment; rather, the nonmoving party bears the responsibility of identifying applicable evidence. *See Bombard v. Ft. Wayne Newspapers, Inc.,* 92 F.3d 560, 562 (7th Cir. 1996).

In evaluating a motion for summary judgment, the Court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. *See Estate of Cole v. Fromm,* 94 F.3d 254, 257 (7th Cir. 1996). The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *See Anderson,* 477 U.S. at 248; *JPM Inc. v. John Deere Indus. Equip. Co.,* 94 F.3d 270, 273 (7th Cir. 1996). Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute. *See Clifton v. Schafer,* 969 F.2d 278, 281 (7th Cir. 1992). If the moving party does not have the ultimate burden of proof on a claim, it is sufficient for the moving party to direct the Court to the lack of evidence as to an element of that claim. *See Green v. Whiteco Indus., Inc.,* 17 F.3d 199, 201 & n. 3 (7th Cir. 1994). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.,* 94 F.3d 1121, 1124 (7th Cir. 1996).

## III. ANALYSIS

Plaintiffs assert four substantive claims: (1) strict liability for providing a product in a defective condition because it was more dangerous than an ordinary consumer would expect it to be when it was used as it was intended to be used; (2) failure to warn regarding

the propensity of butter flavor to cause severe respiratory disease; (3) common law negligence; and (4) defective product design because the products were more dangerous than an ordinary consumer would expect when it was used as it was intended to be used. Plaintiffs also assert that Givaudan acted intentionally, with malice, aggravated or egregious fraud, oppression, or insult, and with a conscious disregard for their safety, which entitles them to punitive damages. *See*, *generally*, Compl. Givaudan has moved for summary judgment as to each of Plaintiffs' claims.

## A. COUNT I – STRICT LIABILITY DEFECTIVE CONDITION

With respect to Count I, for strict liability, there is no dispute that to state a claim for strict liability for a defective condition under the Indiana Product Liability Act ("IPLA"), a plaintiff must allege that the product was defectively manufactured or prepared. Ind. Code § 34-20-2-2; *Hathaway v. Cintas Corporate Servs., Inc.*, 903 F. Supp. 2d 669, 673-74 (N.D. Ind. 2012) (stating that "[a] product contains a manufacturing defect when it deviates from its intended design" (quoting *Westchester Fire Ins. Co. v. Am. Wood Fibers, Inc.*, No. 2:03-cv-178-TS, 2006 WL 3147710, at *5 (N.D. Ind. Oct. 31, 2006))). Plaintiffs here make no such argument; rather they argue that the product was unreasonably dangerous to the user or consumer because Plaintiffs were unaware that exposure to the product could cause them injury. Compl. ¶¶ 18 -23. In fact, in Count 1 of the Complaint Plaintiffs plead that the defective condition was the failure to warn of the unreasonably dangerous condition. *Id.* ¶ 23. There can be no dispute that there is no strict liability for either defective design or failure to warn claims in Indiana. Ind. Code § 34-20-2-2; *Weigle v. SPX Corp.*, 729 F.3d 724, 737 (7th Cir. 2013) (discussing the 1995 amendments to the

IPLA and Ind. Code § 34-20-2-2).  For these reasons, Givaudan is entitled to summary judgment on Count I for strict liability in tort for a defective condition/manufacture.

## B.  COUNT III – COMMON LAW NEGLIGENCE

With respect to Count III, for common law negligence, the Court concludes that Plaintiffs' negligence claim is subsumed by the IPLA.  Citing *Thiele v. Faygo Beverage, Inc.*, 489 N.E.2d 562 (Ind. Ct. App. 1986); and *Keen v. Nestle Waters North America, Inc.*, Cause No. 1:10-cv-01075-LJM-TAB, 2012 WL 1365444 (S.D. Ind. Apr. 19, 2012); Plaintiffs argue that they are not a "user or consumer" under the IPLA because the product was sold to their employer.  Dkt. No. 466 at 32-34.  Plaintiffs' reliance on *Thiele* and *Keen* is misplaced because in those cases the plaintiffs were employees of middle-men, or distributors, of products to consumers, to which the courts of Indiana have concluded the IPLA does not apply.  *See Estate of Shebel v. Yaskawa Elec. Am., Inc.*, 713 N.E.2d 275, 278 (Ind. 1999) (stating that "'user or consumer' [in the IPLA] does not include one who merely acquires and resells"); *Thiele*, 489 N.E.2d at 588 (concluding that the IPLA does not include employees of "intermediaries in the distributive chain"); *Keen*, 2012 WL 1365444 at *5 (stating that the parties agreed that the case was governed by Indiana common law not the IPLA).  Further, in this case, Plaintiffs' employer, ConAgra, was the first user of the product because it took the product in bulk form and mixed it with other products to produce microwavable popcorn, which triggered protection for ConAgra's employees under the IPLA.  *See Ferguson v. Modern Farm Sys., Inc.*, 555 N.E.2d 1379, 1386 (Ind. Ct. App. 1990) (stating that a company that consumes a product is a consumer under the IPLA); *Thiele*, 489 N.E.2d at 584-88 (discussing the class of "users and consumers" to which the Indiana legislature intended the IPLA to apply, including

employees of a consuming employer).  For these reasons, summary judgment in favor of Givaudan on Count III is appropriate.

## C.  COUNT II – FAILURE TO WARN

With respect to Count II, for failure to warn, Plaintiffs argue that Givaudan purposefully failed to warn them about the dangers of butter flavors when it withheld information on its MSDSes regarding permanent lung damage that could occur if they did not use full-face respirators.  Givaudan asserts that it is entitled to summary judgment on this claim because it reasonably relied upon ConAgra to protect its employees from any dangers associated with butter flavors used in ConAgra's plants.  The Court agrees with Givaudan that the sophisticated intermediary doctrine applies in this case and that it is entitled to summary judgment on this claim.

In Indiana, a manufacturer has "a duty to warn reasonably foreseeable users of all 'latent danger[s] inherent in the product's use.'" *First Nat'l Bank & Trust Corp. v. Am. Eurocopter Corp.*, 378 F.3d 682, 690 (7th Cir. 2004) (quoting *Taylor v. Monsanto Co.*, 150 F.3d 806, 808 (7th Cir. 1998)).  A breach of this duty occurs when a manufacturer "fails to: (1) properly package or label the product to give reasonable warnings of danger about the product; or (2) give reasonably complete instructions on proper use of the product." Ind. Code § 34-2-4-2.  Although the duty to warn is non-delegable, Indiana has established an exception to this general rule called the sophisticated intermediary doctrine.  *See Am. Eurocopter*, 378 F.3d at 691; *Hathaway v. Cintas Corp. Servs., Inc.*, 903 F. Supp. 26 669, 676 (N.D. Ind. 2012) (citing *Nat'l Gas Odorizing, Inc. v. Downs*, 685 N.E.2d 155, 163 (Ind. Ct. App. 1997)).  This doctrine is applicable if "(1) the product is sold to an intermediary with knowledge or sophistication equal to that of the manufacturer;

(2) the manufacturer adequately warns the intermediary; and (3) the manufacturer can reasonably rely on the intermediary to warn the ultimate consumer." *Am. Eurocopter*, 378 F.3d at 691 (citation omitted). "Reliance is only reasonable if the intermediary knows or should know of the product's dangers." *Downs*, 685 N.E.2d at 164. Further, "[a]ctual or constructive knowledge may arise where either the supplier had provided adequate explicit warning of such dangers or information of the product's dangers is available in the public domain." *Id.* In making an analysis under the sophisticated intermediary doctrine, the Court should also consider the following factors:

> [T]he likelihood or unlikelihood that harm will occur if the [intermediary] does not pass on the warning to the ultimate user, the [] nature of the probable harm, the probability or improbability that the particular [intermediary] will not pass on the warning and the ease or burden of the giving of the warning by the manufacturer to the ultimate user.

*Id.* at 163 (quoting *Dole Food v. N.C. Foam Indus. Inc.*, 935 P.2d 876, 880 (Ariz. Ct. App. 1996), further citation omitted). *See also Am. Eurocopters*, 378 N.E.3d at 691-92; *Hathaway*, 903 F. Supp. 2d at 676. Although the question of whether a manufacturer has discharged its duty under the sophisticated intermediary doctrine is almost always one for a jury, summary judgment may be appropriate as a matter of law. *See*, *e.g.*, *Am. Eurocopters*, 378 N.E.3d at 692; *Taylor*, 150 F.3d at 808-09; *Hathaway*, 903 F. Supp. 2d at 677; *York v. Union Carbide Corp.*, 586 N.E.2d 861, 872 (Ind. Ct. App. 1992).

In this case, summary judgment is appropriate under the sophisticated intermediary doctrine because Plaintiffs' articulation of the evidence of Givaudan's knowledge stretches too far from facts presented in the relevant documents. The fact is that neither Givaudan, nor its hired professionals, nor its trade association discovered any connection between respiratory problems at flavoring plants and diacetyl in the 1990s.

Plaintiffs' evidence shows that Givaudan researched the cause of Ms. Irick's problems, and the other individuals who were diagnosed with lung diseases in the 1990s, and had identified diacetyl as a potential problem, but none of the work it or its researchers performed in that decade revealed any specific cause for its employees' health issues. Dkt. No. 481 at 8-11; Dkt. No. 466 at 10-14; Dkt. No. 466-26. Plaintiffs make much of the 1997 FEMA meeting, which discussed a broad range of potential lung diseases, but none of the materials from that meeting make any connection between diacetyl and lung ailments. Dkt. No. 466 at 15; Dkt. No. 466-30. Further, despite Plaintiffs' characterization of the Givaudan internal policies regarding handling diacetyl otherwise, the evidence shows that Givaudan's procedures were related to the use of straight liquid diacetyl without other additives. Dkt. No. 466 at 7; Dkt. No. 466-12. Givaudan's own procedures for handling mixtures of the material with other products or using powder formed from straight liquid diacetyl were no different than those it recommended for handling the mixtures it sold as butter flavors to ConAgra. Compare Dkt. No. 466-12 to Dkt. No. 466 at 8 (stating that in well ventilated areas, respirators were not normally required; and that gloves and chemical goggles should be worn when working around powdered butter flavors). In other words, there is no evidence to support Plaintiffs' assertion that Givaudan withheld known safety information from ConAgra.

Moreover, the undisputed evidence shows that ConAgra knew as much if not more than Givaudan with respect to the danger of butter flavors as they were used in the Plant where Plaintiffs worked. ConAgra has been manufacturing microwave popcorn and using butter flavors since the late 1970s; and in the early 1990s, ConAgra produced and sold the Orville Redenbacher brand of microwave popcorn. Dkt. No. 457 at 5. It has known

that butter flavors contained diacetyl, as well as other volatile organic compounds, since the early 1990s. *Id.* More importantly, ConAgra knew at this time that ingredients in butter flavors were capable of irritating the respiratory tract. *Id.* In the early 1990s ConAgra even performed its own study of the volatile organic compounds released during the microwave process. *Id.* at 6. There is also no dispute that ConAgra worked with butter flavor manufacturers on formulations for its products and knew that the flavors contained diacetyl because ConAgra scientists regularly communicated with suppliers regarding the amount of diacetyl in them. *Id.* Further, ConAgra managers at the Plant knew that one of its own subsidiaries, Armour, sold butter flavors that contained diacetyl at a concentration of 48,000 parts per million. *Id.* at 6-7.

ConAgra, a large sophisticated company, also had its own occupational health department, which was responsible for the health and safety of its workers. *Id.* at 7. In addition to the MSDSes from its suppliers, ConAgra's industrial hygiene program drew from other sources. *Id.* at 7-8.

It is undisputed that in October 2001, at least two of the top four managers at ConAgra learned more about the NIOSH investigation of lung disease at the GML microwave popcorn facility in Jasper, Missouri, through meetings of an ad hoc committee of the Popcorn Board. Dkt. No. 457 at 10. The NIOSH investigation focused on the purported link between diacetyl exposure and lung disease. *Id.* ConAgra acknowledged at that time that "the cat is out of the bag" with respect to health issues and butter flavors. *Id.*at 11. In fact, ConAgra managers with responsibility for the Plant were part of the ad hoc working group that attempted to develop best practices tip sheets regarding microwave popcorn worker safety. *Id.* ConAgra also received a copy of the FEMA

workbook entitled "Respiratory Safety in the Flavor and Fragrance Workplace." *Id.* There can be no dispute that ConAgra was well-versed on the issues related to butter flavors and worker health.

The fact that ConAgra's managers at the Plant stressed the differences between its processes and that at GML is not evidence that they did not believe there was a problem with butter flavors. Dkt. No. 466 at 17-18; Dkt. No. 466-35 at 2; Dkt. No. 438 at 4-5; Dkt. No. 466-36 at 2-3. Rather, the only reasonable inference is that ConAgra knew it had responsibility for providing a safe environment and had assessed that the system at its plants complied with current best practices. There can be no dispute that ConAgra had its own information regarding the health hazards of butter flavors at its plants. In 2001, NIOSH investigated ConAgra's Hamburg, Iowa, plant. Dkt. No. 457 at 11-12. In 2002, NIOSH began an evaluation of the health hazards at ConAgra's microwave popcorn facility in Marion, Ohio. Dkt. No. 466-36 (McKeon memo discussing NIOSH and independent air samplings studies at Marion). ConAgra's memos to its employees expressly referenced NIOSH's failure to find anything of significance at its plants with respect to levels of diacetyl and other potentially threatening chemicals. Dkt. Nos. 466-35 & 466-36. Again, the only reasonable inference is that ConAgra was well aware of the alleged threat to its employees' health from butter flavors and was taking steps to protect them from harm consistent with industry standards that were not set by Givaudan, but by the entire industry as well as state and local agencies. Under these circumstances, a reasonable jury could only conclude that ConAgra was a sophisticated intermediary that was as knowledgeable as Givaudan about the potential health hazards of butter flavors and upon which Givaudan could reasonably rely to protect workers at the Plant. For these

reasons, the Court concludes that summary judgment in favor of Givaudan on Count II of Plaintiffs' Complaint.

## D. COUNT IV – DESIGN DEFECT

Although there are other elements to a design defect claim, the analysis for Givaudan's motion for summary judgment on Plaintiffs' claim that Givaudan's butter flavors were defectively designed turns on application of the doctrine of intervening or superseding causation. Similarly to its argument regarding the learned intermediary doctrine, Givaudan argues that ConAgra's actual knowledge of an association between diacetyl in butter flavors and lung diseases, and its complete control over its safety protocols to mitigate its workers' exposure to potentially hazardous substances, breaks the causal chain between Givaudan's alleged defective design and Plaintiffs' alleged injuries. Plaintiffs rely exclusively upon their argument that Givaudan's knowledge of the dangers of diacetyl in butter flavors was greater than that of ConAgra to assert that Givaudan caused them harm. In fact, even in the Complaint, Plaintiffs claim that part of the defective design is an inadequate warning. Dkt. No. 1-1, ¶ 65. To the extent that Plaintiffs rely on a failure to warn theory, the Court's analysis on application of the doctrine of a sophisticated intermediary applies. With respect to defective design of the butter flavors themselves, neither party adequately addresses Indiana's superseding causation doctrine, which is focused on whether "the harm resulting from the intervening act could not have been reasonably foreseen by the original negligent actor." *Hooks SuperX Inc. v. McLaughlin*, 642 N.E.2d 514, 520 (Ind. 1994). *See also Control Technologies, Inc. v. Johnson*, 762 N.E.2d 104, 107 (Ind. 2002). As the *Hooks SuperX* court explained further, "if harm is a natural, probable, and foreseeable consequence of the first negligent act or

omission, the original wrongdoer may be held liable even though other independent agencies intervene between [its] negligence and the ultimate result." *Hooks SuperX*, 642 N.E.2d at 520 (quoting 21 I.L.E. *Negligence* § 67, at 330-333 (1959)). "[B]ut if the new independent intervening force was not reasonably foreseeable at the time of the actor's wrongful conduct, the consequences ordinarily, are not caused by the original wrongful act." *Id.* (quoting 21 I.L.E. *Negligence* § 67, at 330-333).

Applying this rule to the facts presented regarding Plaintiffs' design defect claim, the Court cannot conclude as a matter of law that ConAgra's worker safety policy at the Plant was an unforeseeable independent intervening force such that it could be considered a superseding cause. This is not a question of whether or not ConAgra was a learned intermediary because that defense does not apply to design defects; it is a question of whether or not ConAgra's use of the butter flavors and its worker protection program were unforeseeable by Givaudan. The latter question is not answered by the facts presented; therefore, summary judgment on Plaintiffs' design defect claim on this ground must be denied. In making this ruling the Court makes no conclusion with respect to Plaintiffs' evidence to support other elements of a design defect claim.

## IV.  **CONCLUSION**

For the reasons stated herein, Defendant Givaudan Flavors Corporation's Motion for Summary Judgment as to all Plaintiffs' claims, Dkt. No. 455, is **GRANTED in part and DENIED in part**.

IT IS SO ORDERED this 1st day of June, 2017.

LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Electronically distributed to all registered
attorneys of record via ECF.

27